# IN THE SUPREME COURT OF IOWA

No. 15–1169

Filed April 15, 2016

Amended August 23, 2016

**NICK C. RHOADES,**

Appellant,

vs.

**STATE OF IOWA,**

Appellee.

Appeal from the Iowa District Court for Bremer County, DeDra Schroeder, Judge.

Plaintiff appeals the district court's award of summary judgment to the State of Iowa in a wrongful imprisonment action. **AFFIRMED.**

Dan Johnston, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and John McCormally, Assistant Attorney General, for appellee.

**APPEL, Justice.**

In this case, we consider whether a defendant who has pled guilty to a criminal offense but later successfully challenged the validity of the plea may qualify as a "wrongfully imprisoned person" under Iowa Code section 663A.1 (2015).

## I. Background Facts and Proceedings.

Nicholas Rhoades was HIV positive when he came in contact with A.P. on a social networking site. After exchanging messages, A.P invited Rhoades to his home. A.P. understood Rhoades to be HIV negative, in part because of Rhoades's online profile. Rhoades and A.P. engaged in consensual unprotected oral and protected anal sex at A.P.'s home. When A.P. learned that Rhoades was HIV positive, he contacted law enforcement. Rhoades was charged with criminal transmission of HIV in violation of Iowa Code section 709C.1 (2007).[1]

Ultimately, Rhoades pled guilty to one count of criminal transmission of HIV. The district court sentenced Rhoades to a term in prison not to exceed twenty-five years with life parole and required Rhoades to be placed on the sex offender registry. Rhoades filed a motion to reconsider the sentence. The district court then suspended Rhoades's twenty-five-year sentence and placed Rhoades on probation for five years. Rhoades did not appeal.

About six months later, Rhoades filed an application for postconviction relief. Rhoades alleged that his trial counsel provided ineffective assistance by allowing Rhoades to plead guilty to a charge for which there was no factual basis. The district court denied relief, and the court of appeals affirmed. We granted further review. On further

---

[1]In 2014, Iowa Code chapter 709C was repealed and replaced by chapter 709D, the Contagious or Infections Disease Transmission Act. *See* 2014 Iowa Acts ch. 1119.

review, we reversed the judgment of the district court. *See Rhoades v. State*, 848 N.W.2d 22, 33 (Iowa 2014).

In that appeal, Rhoades claimed that his guilty plea was invalid because there was not substantial evidence to support the plea. Among other things, Rhoades stressed that at the time of his offense, his viral load was virtually undetectable. He argued that in light of the developments in medicine, there was insufficient factual evidence to support the guilty plea. The mere fact that he knew he had HIV, Rhoades argued, was not enough to provide a factual basis for the crime.

We first began by examining the elements of the offense. *Id.* at 26. One of the elements of criminal transmission of HIV was "intimate contact." Iowa Code § 709C.1(1)(*a*). The statute defined "intimate contact" as "the intentional exposure of the body of one person to a bodily fluid of another person in a manner that could result in the transmission of the human immunodeficiency virus." *Id.* § 709C.2(*b*).

We then examined the colloquy before the district court in accepting the guilty plea. *Rhoades*, 848 N.W.2d at 29. When the district court asked Rhoades whether he had engaged in "intimate contact" with another person, Rhoades responded "Yes sir." *Id.*

We held that the admission that he had engaged in "intimate contact" with another was not a sufficient basis to support the guilty plea. *Id.* at 30. We concluded that the district court had used technical terms from the statute but that such conclusory terms were insufficient to establish that the defendant acknowledged facts consistent with the completion of the crime. *Id.* We further noted the minutes of testimony and the presentence investigation report did not provide a factual basis for the element of intimate contact. *Id.* at 31.

Finally, we considered whether judicial notice could be taken of the fact that a person with HIV could transmit the disease. *Id.* We concluded that we could not take judicial notice that an infected person could transmit HIV regardless of the viral load. *Id.* at 32. In light of advances in medicine, we concluded, on the record presented below, that there was insufficient evidence to show that Rhoades exchanged bodily fluids with A.P. or intentionally exposed A.P. to the disease. *Id.* at 32–33.

We remanded the case back to the district court. *Id.* at 33. Because it was possible the State may have been able to establish the necessary factual basis, however, we directed the district court to give the State an opportunity to do so. *Id.* If the State was unable to do so, we stated that the plea must be withdrawn and the State could proceed accordingly. *Id.* On remand, the State dismissed the charges against Rhoades.

Rhoades then filed an action under Iowa Code chapter 663A (2015), asserting that he was wrongfully imprisoned by the State and entitled to compensation. Under Iowa Code section 663A.1, a person may be a wrongfully imprisoned person and entitled to relief only if

> [t]he individual did not plead guilty to the public offense charged, or to any lesser included offense, but was convicted by the court or by a jury of an offense classified as an aggravated misdemeanor or felony.

*Id.* § 663A.1(1)(*b*).

The State filed a motion to dismiss, arguing that under the statute, Rhoades was not entitled to relief because he had pled guilty in a criminal case that provided the basis for the imprisonment. The district court granted the State's motion to dismiss.

## II.  Standard of Review.

This case involves a question of statutory interpretation.  Such questions are reviewed for errors at law.  *State v. Hagen*, 840 N.W.2d 140, 144 (Iowa 2013); *Sanchez v. State*, 692 N.W.2d 812, 816 (Iowa 2005).

## III.  Background to Wrongful Imprisonment Statutes.

**A. Wrongful Convictions: From Case Studies to DNA.**  For many decades, the question of wrongful imprisonment has been a question of public debate.  Beginning in 1932 with the publication of Edwin M. Borchard's *Convicting the Innocent: Errors of Criminal Justice*, there has been a steady stream of literature questioning the outcomes of our criminal justice system.  Most of these early critiques involved detailed reconstruction and study of the records in individual cases and assessments of the accuracy of conclusions of guilt reflected in jury verdicts.  *See* Adele Bernhard, *When Justice Fails: Indemnification for Unjust Conviction*, 6 U. Chi. L. Sch. Roundtable 73, 76–78 (1999) [hereinafter Bernhard, *When Justice Fails*] (canvassing early wrongful conviction literature).

With the advent of DNA testing, however, the evidence of wrongful conviction moved from the anecdotal and conjectural to the empirical. The first conviction vacated based on DNA evidence occurred in 1989. Rob Warden, *The Revolutionary Role of Journalism in Identifying and Rectifying Wrongful Convictions*, 70 UMKC L. Rev. 803, 829 (2002).  In 1996, the National Institute of Justice (NIJ) of the United States Department of Justice published a report identifying wrongful convictions for sexual assault and murder.  Edward Connors et al., *Convicted by Juries, Exonerated by Science: Case Studies in the Use of*

*DNA Evidence to Establish Innocence After Trial* (1996) [hereinafter NIJ Report], www.ncjrs.gov/pdffiles/dnaevid.pdf.

Unlike the prior case analysis, the NIJ Report employed DNA evidence to irrefutably prove the innocence of those wrongfully convicted. Walter F. Rowe, *Forward* to NIJ Report, at xv–xvi. Remarkably, in the seven years between 1989 and 1996 in sexual assault cases referred to the FBI, DNA results excluded the prime suspect about twenty percent of the time and only about sixty percent matched or included the primary suspect. Peter Neufeld & Barry C. Scheck, *Forward* to NIJ Report, at xxviii.[2] Other DNA-based studies revealed significant numbers of wrongful convictions. *See* Samuel R. Gross et al., *Exoneration in the United States 1989 through 2003*, 95 J. Crim. L. & Criminology 523, 524 (2005). The DNA-related developments stimulated law school affiliated organizations like the Innocence Project, affiliated with the Cardozo Law School, the Medill Justice Project, affiliated with Northwestern University, and the National Registry of Exonerations at the University of Michigan Law School to document and analyze wrongful convictions. *What is the Innocence Project? How Did it Get Started?*, Innocence Project, www.innocenceproject.org/inpr/faqs/what-is-the-innocence-project-how-did-it-get-started (last visited Apr. 14, 2016); Medill Justice Project, *About Us*, www.medilljusticeproject.org/about-us-2 (last visited Apr. 14, 2016); The National Registry of Exonerations, *Our Mission*, Univ. of Mich. Law Sch., www.law.umich.edu/special/exoneration/Page/mission.aspx.[3]

---

[2]The results were inconclusive in twenty percent or so remaining cases. *Id.*

[3]Organized efforts to examine wrongful convictions have reached Iowa. The Innocence Project of Iowa has affiliations with the University of Iowa Law School and Drake Law School. *About the Innocence Project of Iowa*, Innocence Project of Iowa, www.iowainnocence.org/about-innocence-project-iowa (last visited Apr. 14, 2016). Governor Branstad has recently announced the creation of a Wrongful Conviction

The growing number of DNA-related exonerations provided the opportunity for retrospective study[4]—specifically, the study of what went wrong in these cases where DNA evidence exonerated those that had been convicted of serious crimes. The retrospective study of these convictions showed that they were frequently based upon false confessions obtained from the defendant,[5] eyewitness identification that proved to be unreliable,[6] failure of the state to turn over exculpatory

_____

Division in the Office of the State Public Defender to systematically review and identify potential cases involving wrongful convictions and pursue available legal remedies. Press Release, Office of the Governor of Iowa, Governor Branstad Announces Creation of the Wrongful Conviction Division (Oct. 26, 2015), https://governor.iowa.gov/ 2015/10/governor-branstad-announces-creation-of-the-wrongful-conviction-division.

[4]Although DNA analysis has led to many recent exonerations, wrongful convictions result from causes other than the lack of highly reliable scientific methods at time of trial. *See* Daniel S. Medwed, *Anatomy of a Wrongful Conviction: Theoretical Implications and Practical Solutions*, 51 Vill. L. Rev. 337, 356 (2006) ("[T]he bulk of wrongful convictions . . . lack any biological evidence that could be subject to DNA testing."); Daniel S. Medwed, *California Dreaming? The Golden State's Restless Approach to Newly Discovered Evidence of Innocence*, 40 U.C. Davis L. Rev. 1437, 1440 (2007) (estimating that only ten to twenty percent of criminal cases have biological evidence capable of DNA testing).

[5]*See* Brandon L. Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* 15–17 (2011) (noting how an exonerated defendant drew accurate diagrams of three crime scenes though he had no direct knowledge); Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 891 (2004); Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 88–90 (2008) [hereinafter Garrett, *Judging Innocence*]; Brandon L. Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051, 1051 (2010); Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. Crim. L. & Criminology 429, 477– 79 (1998); *see also Corley v. United States*, 556 U.S. 303, 321, 129 S. Ct. 1558, 1570, 173 L. Ed. 2d 443, 458 (2009) ("[T]here is mounting empirical evidence that [interrogation tactics] can induce a frighteningly high percentage of people to confess to crimes they never committed . . . ."). *But see* Paul G. Cassell, *The Guilty and the "Innocent": An Examination of Alleged Cases of Wrongful Conviction from False Confessions*, 22 Harv. J.L. & Pub. Pol'y 523, 586–87 (1999) (suggesting that false confessions are not apparently pervasive but rather concentrated among the intellectually disabled).

[6]*See* Garrett, *Judging Innocence*, 108 Colum. L. Rev. at 78–82; Cynthia E. Jones, *The Right Remedy for the Wrongly Convicted: Judicial Sanctions for Destruction of DNA Evidence*, 77 Fordham L. Rev. 2893, 2929–32 (2009) [hereinafter Jones]; Daniel S. Kahn, *Presumed Guilty Until Proven Innocent: The Burden of Proof in Wrongful Conviction*

evidence,[7] use of unreliable informant testimony,[8] and ineffective assistance of counsel.[9]

**B. Wrongful Convictions and Plea Bargaining.** The vast majority of cases, however, are not decided after trial, but are resolved by plea bargaining.[10] The United States Supreme Court has observed, "In today's criminal justice system . . . the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for

---

*Claims Under State Compensation Statutes*, 44 U. Mich. J.L. Reform 123, 128 (2010) [hereinafter *Presumed Guilty*] (noting the United States Department of Justice has issued Eyewitness Evidence Guidelines, which were designed to help law enforcement curb inaccurate identifications and incorporated more than twenty years of scientific research on memory and interview techniques); Meghan J. Ryan & John Adams, *Cultivating Judgment on the Tools of Wrongful Conviction*, 68 SMU L. Rev. 1073, 1088 (2015) [hereinafter Ryan & Adams]; *see also United States v. Wade*, 388 U.S. 218, 228–29, 87 S. Ct. 1926, 1933, 18 L. Ed. 2d 1149, 1158 (1967) (noting challenges of obtaining reliable eye witness identification); *State v. Henderson*, 27 A.3d 872, 919–21 (N.J. 2011) (revising procedures for eyewitness identification evidence in light of advancing science under the due process clause of the New Jersey Constitution).

[7]*See* Kevin C. McMunigal, *Guilty Pleas,* Brady *Disclosure, and Wrongful Convictions*, 57 Case W. Res. L. Rev. 651, 656–62 (2007) (reviewing effect of *Brady* violations on wrongful convictions through guilty pleas); Ryan & Adams, 68 SMU L. Rev. at 1093–96 (citing both intentional and unintentional conduct by law enforcement as contributing to wrongful convictions).

[8]*See* Alexandra Natapoff, *Snitching: Criminal Informants and the Erosion of American Justice* 69–72 (2008); Jones, 77 Fordham L. Rev. at 2936–37; *see also United States v. Colomb*, 448 F. Supp. 2d 750, 753–56, 758 (W.D. La. 2006) (vacating conviction based on new letter showing that government informant offered to purchase documents and photographs to fabricate evidence).

[9]*See* John H. Blume & Sheri Lynn Johnson, Gideon *Exceptionalism?*, 122 Yale L.J. 2126, 2137–43 (2013); Stephen B. Bright, *Legal Representation for the Poor: Can Society Afford this Much Injustice?*, 75 Mo. L. Rev. 683, 703–05 (2010); Michele Nethercott, *Indigent Defense: Faulty Forensic Evidence*, The Champion, June 2003, at 61 (advocating that public defenders improve their "dismal" performance in catching faulty forensic evidence by pooling resources and establishing public defender forensic units).

[10]Between 2008 and 2012, more than ninety-six percent of all criminal cases culminated in plea bargains rather than trial. U.S. Sentencing Comm'n, *2012 Sourcebook of Federal Sentencing Statistics* fig. C, www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2012/FigureC.pdf.

a defendant." *Missouri v. Frye*, 566 U.S. ___, ___, 132 S. Ct. 1399, 1407, 182 L. Ed. 2d 379, 390 (2012).

The unlikelihood of an innocent defendant pleading guilty in open court is an appealing assumption. Kevin C. McMunigal, *Guilty Pleas,* Brady *Disclosure, and Wrongful Convictions*, 57 Case W. Res. L. Rev. 651, 656 (2007) [hereinafter McMunigal, *Guilty Pleas*]. The conventional wisdom was that the problem of innocents pleading guilty was exaggerated and the likelihood of persuading an innocent defendant to falsely confess minimal. Rodney Uphoff, *Convicting the Innocent: Aberration or Systemic Problem?*, 2006 Wis. L. Rev. 739, 796–802 (2006).

Recently, however, scholars have devoted increased attention to the role of plea bargaining in false convictions. Just as the conventional wisdom that an innocent party does not confess has been challenged, so too has the conventional wisdom that innocent persons do not plead guilty. Many scholars now recognize that at least in some circumstances, an innocent person may rationally decide to plead guilty.

First, in an era of harsh punishments and sentence enhancement, "[w]hen the deal is good enough, it is rational to refuse to roll the dice, regardless of whether one believes the evidence establishes guilt beyond a reasonable doubt, and regardless of whether one is factually innocent."[11] Russell D. Covey, *Longitudinal Guilt: Repeat Offenders, Plea*

---

[11]The James Ochoa case is a classic case cited by the commentators. Ochoa was charged with a car-jacking robbery and faced a sentence of twenty years to life. *James Ochoa*, Innocence Project, www.innocenceproject.org/cases-false-imprisonment/james-ochoa (last visited Apr. 14, 2016). He accepted a plea with a two-year sentence. *Id.* The stolen car was found, however, with clothing inside identified by the victim as belonging to the perpetrator. *Id.* The clothing was subjected to DNA testing and the real perpetrator ultimately identified and arrested. *See Ochoa v. City of Buena Park*, No. SACV 07–00443–JVS (MLGx), 2008 WL 2003761, at *1 (C.D. Cal. Apr. 8, 2008); Garrett, *Judging Innocence*, 108 Colum. L. Rev. at 74 n.71; Peter A. Joy, *Brady and Jailhouse Informants: Responding to Injustice*, 57 Case W. Res. L. Rev. 619, 626 (2007).

*Bargaining, and the Variable Standard of Proof*, 63 Fla. L. Rev. 431, 450 (2011); *see also* John H. Blume & Rebecca K. Helm, *The Unexonerated: Factually Innocent Defendants Who Plead Guilty*, 100 Cornell L. Rev. 157, 180 (2014) [hereinafter Blume & Helm]; Donald G. Gifford, *Meaningful Reform of Plea Bargaining: The Control of Prosecutorial Discretion*, 1983 U. Ill. L. Rev. 37, 49 ("The reality of sentencing differentials is generally enough to deprive defendants of any real choice in plea bargaining."). Iowa has enacted a number of sentence enhancing statutes that could give rise to a risk of such false guilty pleas. *See, e.g.*, Iowa Code §§ 124.401A, .401C; *id.* § 901A.2; *id.* §§ 902.7, .8, .9(1)(*c*), .8A, .11, .14; *id.* §§ 903B.1, .2.

Second, in a somewhat different context, a defendant who prevails in the appellate process may be willing to plead guilty to a lesser offense and obtain immediate release based on time served rather than experience delayed release depending upon the outcome of another trial. Blume & Helm, 100 Cornell L. Rev. at 161, 177, 179 (citing examples of the West Memphis Three, Sterling Spann, and Edward Lee Elmore). In Iowa, for instance, Curtis McGhee agreed to an *Alford* plea to avoid a life sentence, but later all charges were dismissed as a result of prosecutorial misconduct. *McGhee v. Pottawattamie County*, 547 F.3d 922, 925 (8th Cir. 2008).

Third, while it might be assumed that no one knows better than the defendant whether he committed the crime, this assumption may not always be true. A defendant might not have adequate knowledge of the elements of the crime and facts necessary to establish them to knowingly and intelligently plead guilty. McMunigal, *Guilty Pleas*, 57 Case W. Res. L. Rev. at 656–57; *see* Kevin C. McMunigal, *Disclosure and Accuracy in the Guilty Plea Process*, 40 Hastings L.J. 957, 983–84 (1989). Indeed,

Rhoades's lack of knowledge about what constitutes the elements of the crime seems to have been a significant factor in his guilty plea in this case.

A prominent federal judge recently published an article raising questions about the accuracy of guilty pleas, at least in some contexts. Jed S. Rakoff, *Why Innocent People Plead Guilty*, N.Y. Rev. Books (Nov. 20, 2014), www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/; *see also Why Are People Pleading Guilty to Crimes They Didn't Commit?*, Innocence Project (Nov. 25, 2015), www.innocenceproject.org/news-events-exonerations/2015/why-are-people-pleading-guilty-to-crimes-they-didn2019t-commit/.

Increasingly, there is empirical evidence to support the assertion that innocent people sometimes plead guilty. In the original NIJ study in 1996, only one case was listed in which an innocent man entered an *Alford* plea to avoid the death penalty. NIJ Report at 73–74. In 2015, however, the National Registry of Exonerations reported that 65 out of 149 exonerations arose from guilty pleas. The National Registry of Exonerations, *Exonerations in 2015* 1 (2016), www.law.umich.edu/special/exoneration/Documents/Exonerations_in_2015.pdf. Thirteen percent of all wrongful convictions listed in the National Registry of Exonerations are the result of guilty pleas. The National Registry of Exonerations, *The First 1,600 Exonerations* 2 (2015), www.law.umich.edu/special/exoneration/Documents/1600_Exonerations.pdf (collecting data from 1600 exonerations occurring between January 1989 and May 2015). According to the Innocence Project, 31 of the 330 postconviction DNA exonerees pled guilty to serious crimes. Alexandra Natapoff, *Negotiating Accuracy: DNA in the Age of Plea Bargaining* 3 &

n.15 (forthcoming 2016) [hereinafter Natapoff, *Negotiating Accuracy*], http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2693218.

Additional evidence that guilty pleas may be inaccurate can be found in the record of mass exonerations arising from the Rampart and Tulia investigations in California and Texas. *See* Russell Covey, *Police Misconduct as a Cause of Wrongful Convictions*, 90 Wash. U. L. Rev. 1133, 1137–41 (2013) [hereinafter Covey, *Police Misconduct*].[12] In these mass exonerations, defendants pled guilty eighty-one percent of the time. *Id.* at 1163. These defendants no doubt pled guilty because they feared they would do much worse if they proceeded to trial. *Id.* at 1166. The Rampart and Tulia experiences suggest that the problem of wrongful conviction is not limited to those who contest their guilt at trial and that in the context of these episodes, at least, the method of conviction made little difference to the reliability of the underlying conviction. *Id.* at 1163.[13]

---

[12]Rampart is an area northwest of downtown Los Angeles where extensive unlawful police misconduct was uncovered in the late 1990s. *See* Covey, *Police Misconduct*, 90 Wash. U. L. Rev. at 1137–39. In Tulia, located in Swisher County, Texas, a police officer falsely claimed to have purchased powder cocaine from twenty percent of the African American population. *Id.* at 1139–41.

[13]Plea bargaining has long been a controversial feature of the American criminal justice system. There are, of course, defenders of the institution of plea bargaining. For example, Judge J. Harvie Wilkinson III has generally defended plea bargaining. *See* J. Harvie Wilkinson, *In Defense of American Criminal Justice*, 67 Vand. L. Rev. 1099, 1105, 1139 (2014). Judge Wilkinson argues that the accuracy of pleas is promoted by the requirement that pleas be "intelligent and voluntary." *Id.* at 1139. He also notes that the fact that plea bargaining occurs in "[t]he shadow of trial . . . diminishes the specter of an innocent man copping a plea." *Id.* at 1141. Judge Wilkinson further notes that to constrain the autonomy of the accused in plea bargaining would disregard, rather than respect, fundamental liberties. *Id.* at 1141–43; *see also* Scott W. Howe, *The Value of Plea Bargaining*, 58 Okla. L. Rev. 599, 629–34 (2005) (generally defending plea bargains though recognizing that convincing evidence exists that false guilty pleas do occur and acknowledging that a plea bargain followed by the discovery of incontrovertible evidence that proves innocence should result in exoneration, not enforcement of the bargain).

**C. Remedies for Wrongful Imprisonment.** In addition to growing concern about wrongful convictions, there also has been an increased recognition of the limited nature of available remedies.[14] Wrongfully convicted persons may attempt to bring civil rights claims under 42 United States Code section 1983 (2012), but nonconstitutional mistakes are not actionable. *Porter v. White*, 483 F.3d 1294, 1308 (11th Cir. 2007); Brandon L. Garrett, *Innocence, Harmless Error, and Federal Wrongful Conviction Law*, 2005 Wis. L. Rev. 35, 53–54 (2005) [hereinafter Garrett, *Innocence*]. Further, even where constitutional violations are present, police and prosecutors are entitled to qualified or absolute immunity. *Imbler v. Pachtman*, 424 U.S. 409, 422–25, 96 S. Ct. 984,

---

[14]Although it may be difficult to obtain relief under civil rights statutes, it might not be impossible. Terry Harrington and Curtis McGhee brought civil rights claims against prosecutors related to alleged prosecutorial misconduct in connection with their trial on first-degree murder charges. In Harrington's case, we ruled that prosecutors suppressed evidence favorable to the accused in September 2003. *Harrington v. State*, 659 N.W.2d 509, 525 (Iowa 2003). Harrington and McGhee later filed a civil rights claim against Pottawattamie County and prosecutors for their actions in the case. *McGhee v. Pottawattamie County*, 475 F. Supp. 2d 862, 866 (S.D. Iowa 2007). The federal district court ruled that prosecutors were absolutely immune from actions related to their failure to turn over exculpatory evidence and their role in fabricating jailhouse informant testimony; but the court ruled *qualified* immunity applied to prosecutors for their actions in connection with the arrest of suspects without probable cause and with the police officer's alleged failure to turn over exculpatory evidence to the defense. *Id.* at 899. After the Eighth Circuit affirmed in part and reversed in part, *see McGhee v. Pottawattamie County*, 547 F.3d 922, 933 (8th Cir. 2008), the United States Supreme Court granted certiorari. *Pottawattamie County v. McGhee*, 556 U.S. 1181, 129 S. Ct. 2002, 173 L. Ed. 2d 1083 (2009). Before the Court could decide the issue, the parties reached a settlement on December 9, 2009, whereby Harrington was to receive $7.03 million and McGhee $4.97 million. As a result, the case before the Supreme Court was dismissed. *Pottawattamie County v. McGhee*, 558 U.S. 1103, 130 S. Ct. 1047, 175 L. Ed. 2d 641 (2010). McGhee, who had entered an *Alford* plea to avoid a life sentence, filed a motion to vacate the plea. *See* Hans Sherrer, *Curtis W. McGhee Jr.,* Forejustice, www.forejustice.org/db/McGhee-Jr--Curtis-W.-.-html (last visited Apr. 14, 2016). Ultimately the charges against McGhee were dismissed. Harrington and McGhee settled a lawsuit against the City of Council Bluffs and its police officers in October 2013 for a total of $6.2 million. *Id.*

991–92, 47 L. Ed. 2d 128, 138–41 (1976); Garrett, *Innocence*, 2005 Wis. L. Rev. at 108–09.

Common law claims of malicious prosecution or abuse of process are available, but one must prove malice. *Fink v. Shawangunk Conservancy, Inc.,* 790 N.Y.S.2d 249, 250 (App. Div. 2005); Garrett, *Innocence*, 2005 Wis. L. Rev. at 50. A common law claim may be available against counsel, *see Barker v. Capotosto*, 875 N.W.2d 157, 161 (Iowa 2016), but such claims will be present only for malpractice and even responsible attorneys may have limited insurance coverage and shallow personal pockets. *See* Manuel R. Ramos, *Legal Malpractice: Reforming Lawyers and Law Professors*, 70 Tul. L. Rev. 2583, 2602 & n.89 (1996) (citing estimates that between thirty and fifty percent of all attorneys are uninsured or underinsured). And to the extent a wrongfully convicted person is represented by a public defender, immunity statutes that govern lawsuits against state employees may apply. Harold H. Chen, Note, *Malpractice Immunity: An Illegitimate and Ineffective Response to the Indigent-Defense Crisis*, 45 Duke L.J. 783, 791–802 (1996) (discussing states which grant qualified or absolute malpractice immunity for public defenders). Finally, a private bill is theoretically available, but most wrongfully convicted persons lack sufficient political power to achieve such results. Bernhard, *When Justice Fails*, 6 U. Chi. L. Sch. Roundtable at 93–94; *see generally* Michael Avery, *Obstacles to Litigating Civil Claims for Wrongful Conviction: An Overview*, 18 B.U. Pub. Int. L.J. 439 (2009) (describing additional methods for wrongfully convicted persons seeking redress and their associated hurdles).

## IV. Overview of Wrongful Imprisonment Compensation Statutes.

**A. Introduction.** In light of the renewed attention to wrongful convictions, the obvious harm resulting from wrongful convictions,[15] and recognition of the lack of available remedies, some twenty-seven states have enacted wrongful imprisonment statutes.[16] *See* Daniel S. Kahn, *Presumed Guilty Until Proven Innocent: The Burden of Proof in Wrongful Conviction Claims Under State Compensation Statutes*, 44 U. Mich. J.L. Reform 123, 134 & n.51 (2010) [hereinafter Kahn]. All of them provide for compensation in some circumstances for wrongfully imprisoned persons without a showing of government culpability that would be required for traditional common law remedies.

Proponents of compensation statutes have noted the difficulty in getting such statutes enacted. As observed by Professor Bernhard, some states have designed statutes to protect the state against envisioned civil litigation. Adele Bernhard, *Justice Still Fails: A Review of Recent Efforts to Compensate Individuals Who Have Been Unjustly Convicted and Later Exonerated*, 52 Drake L. Rev. 703, 706 (2004) [hereinafter Bernhard, *Justice Still Fails*]. Such opposition could be based upon perceived costs, or fear that undeserving individuals will recover. *Id.* at 713.

---

[15]*See generally* Adrian Grounds, *Psychological Consequences of Wrongful Conviction and Imprisonment*, 46 Canadian J. Criminology & Crim. Just. 165 (2004) (providing an overview of psychological effects of wrongful imprisonment in the U.K.).

[16]Another approach is the establishment of independent innocence commissions, state institutions with the power to study or even to review and investigate individual postconviction claims of actual innocence. *See* David Wolitz, *Innocence Commissions and the Future of Post-Conviction Review*, 52 Ariz. L. Rev. 1027, 1045–49 (2010). Innocence commissions have convened in at least six states: California, Connecticut, Illinois, North Carolina, Pennsylvania, and Wisconsin. *Id.* at 1046.

**B. Wrongful Imprisonment Compensation Statutes Strictly Limiting Recovery.** A few states have very tight restrictions on who qualifies for recovery under their wrongful imprisonment compensation statutes. For instance, Missouri, Montana, and Utah limit recovery to those exonerated by DNA evidence.[17] California, Illinois, Maine, Maryland, and North Carolina limit relief only to situations where the party has obtained a pardon from the Governor.[18] These statutes limit potential compensation to cases in which guilt or innocence is undebatable and to the few cases in which compensation is sufficiently acceptable politically for the wrongfully convicted to have obtained a gubernatorial pardon.

**C. Wrongful Imprisonment Statutes Limiting Recovery Based on Causation.** Some statutes are more generously framed but broadly exclude from coverage persons who caused or brought about their conviction because of their own conduct. For example, in West Virginia, the wrongful imprisonment compensation statute declares that a claimant must "not by his or her own conduct cause or bring about his or her conviction." W. Va. Code § 14-2-13a(c)(3) (2015). Similarly, the New Jersey wrongful imprisonment compensation statute requires that a claimant establish he "did not commit or suborn perjury, fabricate evidence, or by his own conduct cause or bring about his conviction," but it excludes from that requirement "a confession or admission later found

---

[17]Mo. Rev. Stat. § 650.058 (2015); Mont. Code Ann. § 53-1-214 (2015); Utah Code § 78B-9-405(1) (2015); *see also* Kahn, 44 U. Mich. J.L. Reform at 137–38, 138 n.62; Donna McKneelen, *"Oh Lord Won't You Buy Me a Mercedes Benz?": A Comparison of State Wrongful Conviction Compensation Statues*, 15 Scholar 185, 198 n.66 (2013).

[18]Cal. Penal Code § 4900 (2014); 705 Ill. Comp. Stat. 505/8(c) (2014); Me. Stat. tit. 14, § 8241(2)(*c*) (2015); Md. Code Ann. State Fin. & Proc. § 10-501(b) (2015); N.C. Gen. Stat. § 148-82 (2015).

to be false." N.J. Stat. 52:4C-3 (2014). The federal wrongful imprisonment compensation statute excludes those who "by misconduct or neglect" cause their own prosecution. 28 U.S.C. § 2513.

Among other things, these conduct disqualifications prohibit recovery by claimants who seek to protect other guilty parties. For example, in *Stevenson v. State*, the claimant was wrongfully convicted but deliberately shielded his identical twin brother who had actually committed the crime. 520 N.Y.S.2d 492, 493 (Ct. Cl. 1987). And in *Taylor v. State*, the claimant did not meet his burden of showing that he did not cause or bring about his conviction when he withheld information implicating his wife in order to protect her. 605 N.Y.S.2d 172, 174 (App. Div. 1993), *aff'd Williams v. State*, 661 N.E.2d 1381 (N.Y. 1995); *see also Moses v. New York*, 523 N.Y.S.2d 761, 764 (Ct. Cl. 1987) (denying a claimant who offered a false alibi compensation). These cases stand for the proposition that claimants who experience imprisonment as a result of an attempt to manipulate the system will not be rewarded by compensation.

**D. Wrongful Imprisonment Compensation Statutes Foreclosing Recovery for Those Who Plead Guilty.** Some wrongful imprisonment compensation statutes reject a broad causation qualification but nonetheless exclude persons who plead guilty from eligibility for compensation. For example, Ohio law provides that a claimant may bring an action under the statute if "[t]he individual was found guilty of, but did not plead guilty to, the particular charge or a lesser-included offense." *See* Ohio Rev. Code Ann. § 2743.48(A)(2) (2014). Similarly, the wrongful imprisonment compensation statute in Oklahoma law provides that in order to recover, a claimant must show "the individual did not plead guilty to the offense charged, or to any

lesser included offense, but was convicted of the offense." Okla. Stat. tit. 51, § 154(B)(2)(b) (2015).

Several jurisdictions, however, have more tightly focused the disqualification for those who have pled guilty. Massachusetts, for instance, requires a claimant "did not plead guilty to the offense charged, or to any lesser included offense, unless such guilty plea was withdrawn, vacated or nullified by operation of law on a basis other than a claimed deficiency in the plea warnings . . . ." Mass. Gen. Laws ch. 258D, § 1(C)(iii) (2015). The District of Columbia statute provides that recovery is not available "to any person whose conviction resulted from his entering a plea of guilty unless that plea was [an *Alford* plea]." D.C. Code § 2-425 (2016). In California, payment is narrowly denied based on a guilty plea only where "a claimant pled guilty with specific intent to protect another from prosecution for the underlying conviction for which the claimant is seeking compensation." Cal. Penal Code § 4903(c) (2014). While Virginia generally excludes those who have pled guilty, there is an exception for persons who were sentenced to death, were convicted of certain classes of felonies, or were convicted of any felony where the punishment is life in prison. Va. Code Ann. § 8.01-195.10(B) (2015). Nebraska's wrongful imprisonment compensation statute provides that a claimant must show that the claimant

> did not commit or suborn perjury, fabricate evidence, or otherwise make a false statement to cause or bring about such conviction or the conviction of another, . . . except that a guilty plea, a confession, or an admission, coerced by law enforcement and later found to be false, does not constitute bringing about his or her own conviction . . . .

Neb. Rev. Stat. § 29-4603 (2015).

**E. Model Legislation.** The ABA has urged states to adopt legislation providing for compensation to wrongfully imprisoned persons.

*See* Am. Bar Ass'n, Section of Criminal Justice, *Report to the House of Delegates* 1–2 (2005), www.americanbar.org/content/dam/aba/ publishing/criminal_justice_section_newsletter/crimjust_policy_my0510 8a.authcheckdam.pdf. The ABA Report recommends a condition precedent to compensation that provides, "The claimant's own misconduct should not have substantially contributed to the conviction." *Id.* at 1.

The Innocence Project has proposed a model wrongful imprisonment statute. This model statute does not exclude persons who plead guilty from seeking compensation. *See* Innocence Project, *Model Legislation: An Act Concerning Claims for Wrongful Conviction and Imprisonment* 3 (2014), www.innocenceproject.org/free-innocent/ improve-the-law/CompensationModelBill2015.pdf. In order to receive compensation, a plaintiff must show that the claimant

> did not commit or suborn perjury, or fabricate evidence to cause or bring about his or her own conviction. However, neither a confession or admission later found to be false, nor a guilty plea to a crime the claimant did not commit constitutes bringing about claimant's own conviction under this Act.

*Id.*; *see* Muhammad U. Faridi, Hillel Hoffman & Paul A. Montuori, *Undoing Time: A Proposal for Compensation for Wrongful Imprisonment of Innocent Individuals*, 34 W. New Eng. L. Rev. 1, 15–16, 45 (2012) [hereinafter Faridi] (advocating the exclusion not of those who pled guilty, but those who caused or brought about wrongful imprisonment "by falsely giving an uncoerced confession of guilt, committing or suborning perjury, or fabricating evidence"); Michael J. Saks et al., *Model Prevention and Remedy of Erroneous Convictions Act,* 33 Ariz. St. L.J. 665, 710 (2001) (advocating the exclusion not of those who pled guilty, but only claims where "[t]he claimant knowingly, intentionally, and voluntarily

brought about the claimant's own conviction"); *see also* Innocence Commission for Virginia, *A Vision for Justice: Report and Recommendations Regarding Wrongful Convictions in the Commonwealth of Virginia* 102 (2005), www.exonerate.org/ICVA/full_r.pdf ("The Virginia General Assembly should extend the availability of the writ of innocence to prisoners who entered a plea other than not guilty.").

**F. Iowa's Wrongful Imprisonment Statute**.  Iowa enacted its wrongful imprisonment statute in 1997.  1997 Iowa Acts ch. 196, § 1 (codified at Iowa Code § 663A.1 (1997)).  The Iowa statute was preceded by enactments of wrongful imprisonment statutes in California, Maine, Maryland, New Hampshire, New York, North Carolina, Ohio, Tennessee, Texas, West Virginia, and Wisconsin and by a federal statute and a statute in the District of Columbia.[19]  Iowa's wrongful imprisonment statute has not been amended since it was first passed in 1997.

Iowa Code chapter 663A establishes a cause of action for damages for a wrongfully imprisoned person.  Iowa Code § 663A.1 (2015).  In order to be a wrongfully imprisoned person, the chapter requires that an individual meet all of the following criteria:

> *a.* The individual was charged, by indictment or information, with the commission of a public offense classified as an aggravated misdemeanor or felony.

> *b. The individual did not plead guilty* to the public offense charged, or to any lesser included offense, *but was convicted by the court or by a jury* of an offense classified as an aggravated misdemeanor or felony.

> *c.* The individual was sentenced to incarceration for a term of imprisonment not to exceed two years if the offense was an aggravated misdemeanor or to an indeterminate term

---

[19]*See* Bernhard, *When Justice Fails*, 6 U. Chi. L. Sch. Roundtable at 73 & n.1 (collecting state, federal, and D.C. wrongful imprisonment statutes along with their dates of enactment).

of years under chapter 902 if the offense was a felony, as a result of the conviction.

      *d.* The individual's conviction was vacated or dismissed, or was reversed, and no further proceedings can be or will be held against the individual on any facts and circumstances alleged in the proceedings which had resulted in the conviction.

      *e.* The individual was imprisoned solely on the basis of the conviction that was vacated, dismissed, or reversed and on which no further proceedings can be or will be had.

*Id.* § 663A.1(1) (emphasis added). In addition to meeting the criteria in (*a*) through (*e*) above, a claimant must prove by a clear and convincing preponderance of evidence that the claimant is actually innocent. *See id.* § 663A.1(2). For the purposes of this appeal, the key portion of this provision is section 663A.1(1)(*b*).

**V. Caselaw Under Wrongful Imprisonment Compensation Statutes Related to Guilty Pleas.**

**A. Introduction.** There have not been many cases under wrongful imprisonment compensation statutes dealing with the impact of guilty pleas on the eligibility of actually innocent persons for compensation. There is a smattering of caselaw, however, from Ohio and New Jersey.

**B. Ohio Caselaw**. In *State v. Moore*, the Ohio Court of Appeals considered whether a claimant who pled guilty to murder was precluded from relief under Ohio's wrongful imprisonment statute. 847 N.E.2d 452, 453–54 (Ohio Ct. App. 2006). The plaintiff had pled guilty to murder charges on the advice of counsel who failed to inform him of exculpatory evidence from gunshot residue testing. *Id.* at 454. The claimant filed a motion for postconviction relief, which was granted. *Id.* At the subsequent trial, evidence was admitted regarding the gunshot

residue along with evidence indicating that another person had confessed to the murder. *Id.* The claimant was acquitted. *Id.*

The claimant then sought compensation under Ohio's wrongful imprisonment statute, which defined a wrongfully imprisoned individual as one who "was found guilty of, but did not plead guilty to," a felony or aggravated felony. *Id.* at 454, 456. The *Moore* court noted under Ohio law, a guilty plea that was not entered into knowingly, voluntarily, and with effective assistance of counsel is void and had no legal effect. *Id.* at 456–57. As a result, the *Moore* court concluded that the claimant's guilty plea was void. *Id.* at 457. The *Moore* court recognized that a strict interpretation of the statute that would preclude recovery even for a void guilty plea would thwart the remedial goals. *Id.*

Similarly, in *Houston v. State*, the Ohio Court of Appeals considered a case where a claimant pled guilty to the offense of having a weapon while under disability. 977 N.E.2d 730, 732 (Ohio Ct. App. 2012). As in *Moore*, the claimant's guilty plea was vacated. *Id.* at 735. The court followed the reasoning in *Moore* in holding that the vacated guilty plea was not a barrier to recovery under the Ohio statute. *Id.* at 739–40.

The Ohio Supreme Court, however, took up the impact of guilty pleas under the Ohio wrongful imprisonment statute in *Dunbar v. State*, 992 N.E.2d 1111, 1112 (Ohio 2013). In *Dunbar*, the accused was charged with three counts of felony abduction and one count of domestic violence. *Id.* The accused agreed to plead guilty to one count of abduction in exchange for a recommended sentence of community control. *Id.* The court, however, sentenced him to two years in prison. *Id.*

On appeal, Dunbar's conviction was reversed. *Id.* The appellate court concluded that the trial court erred by failing to advise Dunbar of the possibility of deviation from the recommended sentence of community control and by not giving him an opportunity to withdraw his plea when the trial court imposed the sentence. *Id.*

On remand, the guilty plea was vacated and the case went to trial. *Id.* at 1113. Dunbar was convicted of one count of abduction and sentenced to a five-year prison term. *Id.* On appeal, however, Dunbar's conviction was again reversed. *Id.* The appellate court concluded that there was insufficient evidence to support the verdict. *Id.* As a result, Dunbar's conviction and sentence were vacated and he was ordered discharged. *Id.*

Dunbar then sought relief under Ohio's wrongful conviction statute. *Id.* The trial court granted his motion for summary judgment. *Id.* The State appealed. *Id.* The Ohio Court of Appeals concluded that Ohio's wrongful imprisonment statute "is ambiguous to the extent that it does not explicitly state whether only valid guilty pleas will preclude recovery, or whether guilty pleas that are void will also preclude recovery." *Id.* (quoting *Dunbar v. State*, No. 97364, 2012 WL 589561, at *3 (Ohio Ct. App. Feb. 23, 2012)). It concluded that a strict interpretation of the statute would "thwart the remedial goals of the statute." *Id.* (quoting *Dunbar*, 2012 WL 589561, at *3). It further concluded that because Dunbar's plea was not entered knowingly, voluntarily, and intelligently, it was void and did not preclude Dunbar from seeking compensation under the statute. *Id.*

The Ohio Supreme Court reversed. *Id.* at 1117. It noted that a judgment is traditionally void only when the court acts without subject matter jurisdiction. *Id.* at 1115. The court reasoned that the basis for

vacating Dunbar's plea may have been an error in the exercise of jurisdiction, it was not an act without jurisdiction. *Id.* at 1116. As a result, the plea was voidable rather than void. *Id.*

Further, the Ohio Supreme Court in *Dunbar* examined the language of the statute. *Id.* It concluded that the statute was not ambiguous. *Id.* The Ohio Supreme Court stated that under the statutory language, the court was to presume that all guilty pleas, even those that are later vacated, are includable because the statute provides no exception for a person whose guilty plea is vacated on appeal. *Id.*

**C. New Jersey Caselaw.** In *Mills v. State,* the New Jersey district court considered the impact of a vacated guilty plea under a wrongful imprisonment statute which required that the claimant "not by his own conduct cause or bring about his conviction." 86 A.3d 741, 747, 750 (N.J. Super. Ct. App. Div. 2014); *see* N.J. Stat. § 52:4C-3. The plaintiff's plea in *Mills* was vacated after an investigation by the United States Department of Justice concluded that five members of the Camden police department engaged in a conspiracy to deprive criminal defendants of their constitutional rights. *Mills,* 86 A.3d at 743. The *Mills* court provided very little analysis but concluded the fact that the defendants pled guilty precluded compensation under the New Jersey statute. *Id.* at 750–51.

**D. Iowa Caselaw Related to Guilty Pleas.** We have considered a number of issues under Iowa Code section 663A.1. *See State v. DeSimone,* 839 N.W.2d 660, 665 (2013) (deciding whether a person acquitted upon a retrial may bring a wrongful imprisonment claim); *State v. McCoy,* 742 N.W.2d 593, 597–98 (Iowa 2007) (determining whether the claimant established actual innocence); *State v. Dohlman,* 725 N.W.2d 428, 431 (Iowa 2006) (reviewing whether there was substantial evidence

that the claimant had not established their right to recover under the statute). We have characterized the process under Iowa Code section 663A.1 as a two-step process. *Dohlman*, 725 N.W.2d at 431 ("If the criteria of both section 663A.1(1) and section 663A.1(2) are met, the individual qualifies as a wrongfully imprisoned person."). The first step involves determining whether the claimant meets the five statutory criteria required to be a wrongly imprisoned person. Iowa Code § 663A.1(1). If an individual meets the criteria, the second step is determining whether the individual has proven by clear and convincing evidence that the individual did not commit the offense or a lesser included offense, or that the offense in question was not committed at all. Iowa Code § 663A.1(2).

With respect to the second prong, or the actual-innocence prong, we have emphasized that under the statute, the claimant has the heavy burden of proving actual innocence. *McCoy*, 742 N.W.2d at 598; *Dohlman*, 725 N.W.2d at 435. As we emphasized in *McCoy* and *Dohlman*, it is not enough for a person seeking compensation as a wrongfully imprisoned person to merely establish that a reviewing court determined the conviction was not supported by substantial evidence. *McCoy*, 742 N.W.2d at 598; *Dohlman*, 725 N.W.2d at 433. The claimant that does not show actual innocence by clear and convincing evidence is not entitled to compensation. *See Smith v. State*, 845 N.W.2d 51, 59 (2014).

We have not had occasion to consider or interpret Iowa Code section 663A.1(1)(*b*) dealing with guilty pleas. We have, however, decided in a number of cases that certain vacated guilty pleas are void. For instance, in *State v. Boone*, we stated that a guilty plea that is not voluntary and knowing was "void." 298 N.W.2d 335, 337 (Iowa 1980). In *Boone*, we relied on a United States Supreme Court case using the same

characterization. *Id.* (citing *McCarthy v. United States*, 394 U.S. 459, 463–64, 466, 89 S. Ct. 1166, 1169, 1171, 22 L. Ed. 2d 418, 423–25 (1969)); *see also State v. Rife*, 260 Iowa 598, 602, 149 N.W.2d 846, 848 (Iowa 1967) (stating an involuntary plea renders any judgment based thereon is void). Thus, if we took the interpretative approach of the Ohio intermediate appellate courts in *Moore* and *Houston*, the guilty plea in this case would be void and not a disqualifying event under the Iowa wrongful imprisonment statute.

**VI. Analysis of Rhoades's Wrongful Imprisonment Compensation Claim.**

**A. Positions of the Parties.** While Rhoades recognizes that he pled guilty to the offense which gave rise to his imprisonment, that guilty plea was later vacated. Citing the Ohio appellate court cases, Rhoades asserts that an invalid guilty plea is a nullity and cannot form a basis for denying relief under Iowa Code chapter 663A. He supports his contention with an affidavit from former State Representative William Bernau, the sponsor of the legislation which created the remedy. Bernau maintained that the purpose of the statute was to allow recovery of those who were wrongfully imprisoned but to prevent recovery by those who are acquitted on a procedural basis. Rhoades asks that we reverse the district court and adjudicate Rhoades as a wrongfully imprisoned person.

The State responds that Rhoades is not a wrongfully imprisoned person because he "pled guilty to the public offense charged." Iowa Code § 663A.1(1)(*b*). In addition to arguing the statute plainly excludes coverage of those who plead guilty, the State emphasizes the decision in *Dunbar*, 992 N.E.2d at 1116. As noted above, the Ohio Supreme Court in *Dunbar* concluded under a statute similar to Iowa's that a vacated guilty plea is a disqualifying event under the statute.

**B. Discussion**.

1. *Principles of statutory interpretation.* We begin by reviewing principles of statutory interpretation. It is of course true that where the language chosen by the legislature is unambiguous, we enforce a statute as written. *McGill v. Fish*, 790 N.W.2d 113, 118 (Iowa 2010). But as our cases amply demonstrate, great care must be used before declaring a statute unambiguous. *See Rolfe State Bank v. Gunderson*, 794 N.W.2d 561, 564 (Iowa 2011). We have noted the need to be circumspect regarding narrow claims of plain meaning and must strive to make sense of our law as a whole. *Id.*

Consistent with our caselaw, the leading treatise on statutory construction cautions against indiscriminate use of the plain meaning approach, noting that "invocation of the plain meaning rule may represent an attempt to reinforce confidence in an interpretation arrived at on other grounds." *See* 2A Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction*, § 46:1, at 161–62 (7th ed. rev. 2014). The treatise further notes "it would seem difficult, or impossible, for courts to determine the meaning of a statutory term or provision without any contextual consideration." *Id.* § 46:4, at 199–200.

Consistent with the treatise's characterization, the determination of whether a statute is ambiguous does not necessarily rest on close analysis of a handful of words or a phrase utilized by the legislature, but involves consideration of the language in context. For example, the phrase "all information" is plain enough and certainly as plain, if not plainer, than the plea bargain language in this case. Yet we inquired further and determined that, in context, all discovery did not literally mean all discovery. *Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice*, 867 N.W.2d 58, 79 (Iowa 2015). Similarly, in context, "all liens" refers to

judgment liens.  *U.S. Bank Nat'l Ass'n v. Lamb*, 874 N.W.2d 112, 119 (Iowa 2016); s*ee also Reg'l Util. Serv. Sys. v. City of Mount Union*, 874 N.W.2d 120, 127 (Iowa 2016) (holding the meaning of statutory terms may depend on context).

A statute is ambiguous if reasonable minds differ or are uncertain as to the meaning of the statute.  *Mall Real Estate, L.L.C. v. City of Hamburg*, 818 N.W.2d 190, 198 (Iowa 2012).  Here, the parties present two plausible interpretations of the statute.  As the State suggests, it is plausible to view the statute as disqualifying all claimants who plead guilty regardless of whether the guilty pleas are later vacated.  This interpretive approach views the guilty plea disqualification as a variant of the cause restrictions found in wrongful termination statutes.  Even if an accused pleads guilty via a guilty plea that is later vacated, the accused has, as a matter of fact, played a role in causing subsequent incarceration.

On the other hand, we ordinarily assume when a legislature enacts statutes it is aware of the state of the law.  *Iowa Farm Bureau Fed'n v. Envtl. Prot. Comm'n*, 850 N.W.2d 403, 434 (Iowa 2014); *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (2013); *State v. Adams*, 810 N.W.2d 365, 370 (Iowa 2012); *Hines v. Ill. Cent. Gulf R.R.*, 330 N.W.2d 284, 288–89 (Iowa 1983).  In 1997, there was ample Iowa caselaw, and indeed caselaw from the United States Supreme Court, standing for the propositions that guilty pleas may be found to be void, which usually means void ab initio and for all purposes.  *Boone*, 298 N.W.2d at 337; *see McCarthy*, 394 U.S. at 463–64, 466, 89 S. Ct. at 1169, 1171, 22 L. Ed. 2d at 423–25.  The question arises whether the legislature intended to disqualify from compensation those who plead guilty when the guilty plea later is found to be void, and thus have no

effect, by the courts. In other words, did the legislature intend a void guilty plea, which has no effect whatsoever, to lead to disqualification under the statute? This interpretive approach was taken by the Ohio appellate courts in *Moore* and *Houston.*

When a statute is ambiguous, we inquire further than the text. We consider "the objects to be accomplished and the evils and mischiefs sought to be remedied." *Klinge v. Bentien,* 725 N.W.2d 13, 18 (Iowa 2006) (quoting *State v. Schultz,* 604 N.W.2d 60, 62 (Iowa 1999)). We seek to advance, rather than defeat, the purpose of the statute. *State v. Tesch,* 704 N.W.2d 440, 451 (Iowa 2005). When the statute is ambiguous, we may consider, among other things, "[t]he object sought to be obtained," "[t]he circumstances under which the statute was enacted," and "the consequences of a particular construction." Iowa Code § 4.6.

In considering the statute in its full context, we do not give weight to the affidavit submitted by Rhoades from a former state legislator. On occasion, we have stated that a court may consider affidavits from legislators describing the factual background of legislation. *See Miller v. Bair,* 444 N.W.2d 487, 488 (Iowa 1989). We have consistently, however, held that affidavits from legislators or former legislators are inadmissible on the subject of legislative intent. *Consolidated Freightways Corp. v. Nicholas,* 258 Iowa 115, 122–23, 137 N.W.2d 900, 905 (1965); *Tennant v. Kuhlemeier,* 142 Iowa 241, 245, 120 N.W. 689, 690 (1909). We do not depart from our established precedent in this case.

Before we confront the main fighting issue in this case, we reject Rhoades's contention that he has demonstrated that he is actually innocent under the second prong of Iowa's wrongful imprisonment compensation statute. In our decision on Rhoades's postconviction appeal, we did not declare Rhoades innocent; we only determined that

there was not sufficient evidence to support his guilty plea. *See Rhoades*, 848 N.W.2d at 33. We remanded to the district court for further proceedings. *Id.* At that point, the State dismissed the case. The discretionary decision of the State to dismiss the case does not establish actual innocence. *See Wilson v. New York*, 7 N.Y.S.3d 217, 219 (App. Div. 2015). On appeal, Rhoades now seeks a declaration from us that he is qualified to make a claim under Iowa Code chapter 663A. However, because he has not established actual innocence, he is at most entitled to a remand to the district court for further proceedings in which he can make such a showing.

2. *Analysis of Iowa's wrongful imprisonment compensation statute regarding guilty pleas.* Based on our review of the statute, we conclude that the guilty plea provisions of the Iowa wrongful imprisonment statute should be interpreted as a type of cause requirement that categorically bars those who have pled guilty. We come to this conclusion for several reasons, none of which are solely determinative but which cumulatively persuade us to so interpret the Iowa statute.

First, while not necessarily dispositive, the language of the statute is our starting point. *State v. Nicoletto*, 845 N.W.2d 421, 429 (Iowa 2014), *superseded by statute*, 2014 Iowa Acts ch. 1114, § 1. Notably, the statute uses past tense conjugations—i.e., "did not plead guilty" and "was convicted"—allowing an interpretation that the statute is focused on the conduct of the defendant as a matter of historical fact and not the legal conclusion of a court on the validity of the guilty plea.[20]

---

[20]The parties have not presented us with any relevant analysis of the legislative history of the enactment of Iowa Code chapter 663A. Our independent review has yielded nothing of value on the narrow issue before us.

We also note that in other somewhat related contexts, the legislature has expressly allowed relief to those who plead guilty. For example, Iowa's DNA statute provides that persons who have pled guilty may still obtain DNA testing if the claimant makes a showing that the DNA evidence "would have . . . invalidated [their] guilty plea." Iowa Code § 81.10(2)(*l*). Although this statute was passed eight years after Iowa's wrongful imprisonment statute, *see* 2005 Iowa Acts ch. 158, § 10, and thus the temporal relationship between the two statutes is somewhat attenuated, the difference in linguistic approach between Iowa's DNA statute and the wrongful imprisonment statute offers at least some support for the view that if the legislature intended to provide relief to those who plead guilty, it knows how to do it. *Farmers Coop. Co. v. DeCoster*, 528 N.W.2d 536, 538–39 (Iowa 1995) (holding when a statute with respect to one subject contains a given provision, the omission of such provision from a similar statute tends to show a different intent existed).

Second, the guilty plea language in our statute should be evaluated against the backdrop of the development of wrongful imprisonment statutes nationally. *See Rathje v. Mercy Hosp.*, 745 N.W.2d 443, 459–60 (Iowa 2008) (canvassing national legal developments as an aid in interpreting Iowa statute). With the exception of New Hampshire, legislatures have generally declined to extend compensation to all wrongfully imprisoned persons who are found actually innocent. Instead, there have been limitations apparently designed to focus compensation on the most deserving defendants and to avoid the potential direct and transactional costs of a less qualified and more generous system.

As noted above, a number of states have refused to provide for compensation for claimants who have caused their conviction. Under this approach, the state should not pay for convictions for which the accused is in part responsible. Thus, the notion that some potential claimants should be denied compensation because of their participation in the process that led to conviction was not an alien concept in the development of wrongful imprisonment statutes.

Such a wide-open cause approach is subject to criticism because, for instance, a coerced confession might disqualify a person from seeking compensation even though DNA testing exonerates the claimant. It thus makes sense to regard the Iowa statute as a narrower, tighter version of the cause requirement, which disqualifies persons who plead guilty but not persons such as those who provided coerced confessions without pleading guilty. The notion that cause limitations in wrongful imprisonment statutes are commonplace gives some credence to the view that the legislature intended its plea bargain limitation to be historical, and not legal, in character. The strong causation theme in wrongful imprisonment legislation tends to undercut the approach of the Ohio intermediate appellate courts in *Moore* and *Houston* and supports the view that the statutory criteria are directed to the fact of a guilty plea, not its underlying legality.

Third, we note the peculiar features of a plea bargain. The legislature may have concluded that it is more unlikely that a person who pleads guilty is actually innocent than when an accused takes a case to trial. A plea bargain also may be regarded as a contract where both sides ordinarily obtain a benefit. One of the benefits to the state from a plea bargain is finality. *See Christian v. Ballard*, 792 F.3d 427, 444 (4th Cir. 2015). As noted by the United States Supreme Court in

*Brady v. United States*, factors favoring pleas include risk avoidance, conservation of prosecution and court resources, efficiency, and timeliness of disposition. 397 U.S. 742, 752, 90 S. Ct. 1463, 1471, 25 L. Ed. 2d 747, 758 (1970). The legislature could rationally believe that allowing one who pleads guilty to later seek compensation from the state unduly unravels the benefit of the bargain.

Fourth, we note that while a plea bargain may occur in the shadow of a trial, and while the nature of the plea bargain may be affected by the merits, there nonetheless is no trial record. Where a person convicted after a trial claims actual innocence under Iowa's compensation statute, the reviewing court has the benefit of a contemporaneously developed record to assist in the determination of whether the claimant has met his or her burden.

In the guilty plea context, however, there will be no such record. As a result, the ability of the trial court to accurately determine a claim of actual innocence may be more difficult in the context of a plea bargain than it is when a claimant has been convicted at trial. One may argue that the risk of nuisance lawsuits in which there are no baseline evidentiary records may be heightened compared to circumstances in which there is a record established at a contemporaneous trial. J.H. Dingfelder Stone, *Facing the Uncomfortable Truth: The Illogic of Post-Conviction DNA Testing for Individuals Who Pleaded Guilty*, 45 U.S.F. L. Rev. 47, 56–60 (2010) (noting the lack of contemporaneous record in plea bargaining contexts).

Finally, an expansive interpretation of the state's waiver of sovereign immunity in the wrongful imprisonment compensation statute could have significant fiscal consequences. *State v. Young*, 265 S.W.3d 697, 707–08 (Tex. App. 2008); Lawrence Rosenthal, *Second Thoughts on*

*Damages for Wrongful Convictions*, 85 Chi.-Kent L. Rev. 127, 134 (2010) (questioning costs and benefits of public insurance for wrongful convictions when government resources are limited and in demand from other forms of social insurance). The legislature could reasonably have decided to limit its financial exposure for wrongful conviction compensation.

We note that a blanket exclusion of otherwise qualified actually innocent persons from compensation because of a guilty plea has been subject to criticism. Only a very small percentage of those charged with felonies actually go to trial. For example, in Iowa only 1.5 percent of the felony convictions were the result of a jury trial in 2012. *See Court Statistics Project*, National Center for State Courts, www.ncsc.org/Sitecore/Content/Microsites/PopUp/Home/CSP/CSP_Criminal (select data year "2012"; select table "Felony Jury Trials and Rates") (last visited Apr. 14, 2016). Thus, an interpretation of the statute that disqualifies all persons who plead guilty, regardless of the legal status of their plea at the time they seek compensation, dramatically narrows the class of persons entitled to compensation for wrongful imprisonment. Under this interpretation of the Iowa statute, one who pled guilty but can still prove actual innocence by clear and convincing evidence is not entitled to compensation. Of course, this approach could be considered a strength or a weakness, depending upon one's point of view and policy preference.

We also recognize the scholarship that suggests innocent individuals may plead guilty to crimes for a variety of reasons, "including ineffective assistance of counsel, overwhelming evidence of guilt based on false confessions or inaccurate forensics, financial and social reasons such as to avoid a costly, embarrassing trial, and pressure by busy

defense lawyers and prosecutors." Faridi, 34 W. New Eng. L. Rev. at 15; *see* Bernhard, *Justice Still Fails*, 52 Drake L. Rev. at 721 (arguing when an innocent person pleads guilty to a crime, the plea is "neither symptomatic of unworthy behavior nor proof of complicity in crime"). Recent empirical information from the National Registry of Exonerations described above tends to confirm this view. Thus, the link between plea bargaining and guilt may not be as strong as previously supposed.

We further acknowledge that the categorical approach barring anyone who has pled guilty for compensation may produce results that seem unattractive. A person who pled guilty based in part on a confession later found to be coerced cannot seek compensation, while a codefendant who similarly confessed and was convicted at trial would be eligible for compensation. A person charged with first-degree murder but who pleads guilty to a lesser included offense in order to avoid a life sentence and is later exonerated by DNA evidence would be ineligible. Or as in the case of Curtis McGhee, a person who has been incarcerated for a long time under a vacated conviction but is offered the prospect of immediate release in exchange for an *Alford* plea is not eligible for compensation. *See* Gross, 95 J. Crim. L. & Criminology at 537–38 (discussing the Curtis McGhee case).

The above difficulties have led the drafters of various model wrongful imprisonment statutes to decline to categorically bar persons who plead guilty. Many academic commentators agree. *See* Bernhard, *Justice Still Fails*, 52 Drake L. Rev. at 721; Natapoff, *Negotiating Accuracy* at 16 (urging amendment of the "master list of wrongful conviction causes" to include plea bargaining).

Although there are substantial arguments that a guilty plea should not disqualify a claimant from seeking compensation for wrongful

imprisonment in all instances, we conclude—based on the language of the statute, the ability of the legislature to use qualifying language in other statutes related to exoneration, the nature of a guilty plea, the lack of a record generated in guilty plea cases, and the potential fiscal impact—that the legislature made a different judgment in 1997. Our job is to do the best we can in interpreting the meaning of legislation. We do not expand the scope of legislation based upon policy preferences. *See Nicoletto*, 845 N.W.2d at 426; *State v. Wedelstedt*, 213 N.W.2d 652, 656–57 (Iowa 1973).

In balancing all the considerations, we think the best interpretation of Iowa Code section 663A.1(1)(*b*) is that it categorically excludes all persons who plead guilty from Iowa's wrongful imprisonment statute. This interpretation leads to a narrow but not impractical or absurd result. As we have stated before, if we have missed the mark, the legislature may respond to correct it. *Rathje*, 745 N.W.2d at 463. We thus conclude that Rhoades is not entitled to pursue a claim for wrongful imprisonment under Iowa Code section 663A. As a result, the district court properly dismissed his claim.

**AFFIRMED.**

Cady, C.J., and Wiggins and Hecht, JJ., join this opinion. Waterman, J., files a specially concurring opinion in which Mansfield, J., joins. Zager, J., files a separate specially concurring opinion.

**WATERMAN**, **Justice (concurring specially).**

I respectfully concur in the result only. To me, the plain language of the statute is dispositive. The legislature limited wrongful imprisonment claims to those who meet the specified requirements for the status of a "wrongfully imprisoned person." One requirement is that "[t]he individual did not plead guilty to the public offense charged." Iowa Code § 663A.1(1)(*b*) (2015). Nick Rhoades in fact did plead guilty. He therefore is ineligible for any recovery of money damages under the unambiguous language of the statute. No further analysis is required.

Mansfield, J., joins this special concurrence.

**ZAGER, Justice (concurring specially).**

I respectfully concur in the result only. I write separately because I would deny relief to Rhoades under the facts of his case. As I stated in my dissent in *Rhoades v. State,* the record, when viewed as a whole and allowing all reasonable inferences, provided an ample factual basis for his guilty plea. 848 N.W.2d 22, 39 (Iowa 2014) (Zager, J., dissenting). I found in that case that his guilty plea was valid, unaffected by any claim of ineffective assistance of counsel. *Id.* The wrongful imprisonment statute requires a finding that "[t]he individual did not plead guilty to the public offense charged." Iowa Code § 663A.1(1)(*b*) (2015). Not only did Rhoades enter a guilty plea, but his guilty plea was supported by a factual basis. He therefore fails to meet the threshold requirement of the statute. Rhoades's valid entry of a factually sufficient guilty plea deprives him of the right to recover under the statute.